Karl E. BROGREN and Paul R. Havig,
on behalf of themselves and others
similarly situated, Plaintiffs,

v.

Carl R. POHLAD, et al., Defendants.

Andrew SALPERTO, on behalf of himself
and all others similarly situated,
Plaintiffs,

v.

Carl R. POHLAD, Donald E. Benson,
James O. Pohlad, and James
Cesario, Defendants.

Civil File Nos. 3–93–714, 3–94–20.

United States District Court,
D. Minnesota,
Third Division.

Sept. 28, 1995.

Robert A. Minish, Frank A. Taylor, Daniel D. Hill, Popham, Haik, Schnobrich & Kaufman, Minneapolis, MN; Joseph W. Anthony, Lenny K. Wallen–Friedman, Fruth & Anthony, Minneapolis, MN; Paul B. Jones, Malkerson, Gilliland, Martin, Minneapolis, MN, for Plaintiff.

David P. Pearson, Thomas H. Boyd, Winthrop & Weinstine, St. Paul, MN; Gregory P. Joseph, Honey L. Kober, Fried, Frank, Harris, Shriver & Jacobson, New York City, for Defendants Carl R. Pohlad, Donald E. Benson, James O. Pohlad, Curtis L. Carlson, Paul R. Christen, I.H. Handmaker, and James A. Cesario.

Brian E. Palmer, Roger J. Magnuson, Peter W. Carter, Dorsey & Whitney, Minneapolis, MN, for Defendants Philip N. Hughes, Irwin L. Jacobs, IRM Fund, IRM Management Partners, IRM General.

Michael F. McGrath, Ravich, Meyer, Kirkman & McGrath, Minneapolis, MN, for Intervenor James A. Potter.

## MEMORANDUM OPINION AND ORDER

DAVIS, District Judge.

This matter came before the Honorable Michael J. Davis on November 9, 1994. Defendants, MEI, Jacobs, and IMR have moved the Court to dismiss plaintiffs' claims that defendants violated sections 10(b) and 20 of the Securities and Exchange Act, 15 U.S.C. section 78j(b) and Rule 10b–5. Defendants have also moved the Court to dismiss plaintiffs' claims of negligent misrepresentation for lack of subject matter jurisdiction under 28 U.S.C. section 1367.

After a thorough review of all of the relevant documents, the Court finds that plaintiffs' complaints have failed to state a cause of action under rule 12(b)(6) for securities fraud against any of the defendants in this case. Therefore, defendants' motions to dismiss are *granted* in their entirety.

1. The cases were certified as a class action pursuant to the Stipulation and Conditional Order dated April 19, 1995.

## FACTUAL BACKGROUND

These two suits arise from the bankruptcy of MEI Diversified, Inc. (MEI) in February 1993. The plaintiff classes[1] allege that MEI's directors and officers violated Sections 10(b) and 20 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10(b)–5, and Regulation S–K, which were promulgated by the Securities Exchange Commission (SEC) pursuant to that statute. They further allege common law negligent misrepresentation.

The *Brogren* plaintiffs consist of individuals and institutions that purchased MEI common stock, notes, and debentures between October 20, 1990 and February 23, 1993. The *Salperto* plaintiffs consist of individuals and institutions that purchased MEI stock between August 11, 1992 and February 22, 1993. MEI directors and officers Carl Pohlad, Donald Benson, James Pohlad, Curt Carlson, Paul Christen, I.H. Handmaker, James Cesario, and Philip Hughes (the MEI defendants) are named in both suits. Irwin Jacobs, as an MEI director, and three business entities allegedly owned and controlled by him, the IMR entities[2], are additional defendants in the *Brogren* Complaint.

Prior to its bankruptcy, MEI's shares were traded publicly on the New York Stock Exchange. Until mid–1990, MEI's primary business was distributing and selling nuts, candy and snack food. In August 1990, through an 80–percent–owned subsidiary named MEI–Regis Salon Corp., MEI acquired the stock of Regis Corporation, The Glemby Company, Inc., and Essanelle Corporation, which operated hair styling salons in shopping malls and department stores. At that time, MEI also purchased New Dimensions in Medicine, a medical products developer and manufacturer. By May 1992, MEI had sold all of its assets of the snack food business and sought to expand its beauty salon business. MEI contracted with Regis Corporation to manage the salons and to perform due diligence on Glemby Company, Inc.

2. Those entities are IMR Fund, L.P., IMR Management Partners, L.P., Inc., and IMR General, Inc.

Both groups of plaintiffs generally allege that defendants made materially misleading public statements and omissions about MEI's performance in order to artificially inflate its stock price, for their own benefits as shareholders, and to hide from capital investors the fact that the company was in dire financial straits.

*Salperto Complaint*

The *Salperto* plaintiffs allege that on or about August 11, 1992, MEI reported a $2,989,000 loss for the quarter ending June 30, 1992. In reporting this result, defendant Benson stated in a press release that the medical products segment produced a positive contribution but that the professional beauty salon segment produced an operating loss:

> Our professional beauty salons' business' second quarter and year-to-date results continue to reflect failure to meet profit expectations on which the acquisition transaction and management agreement with Regis ... were based. In addition to lower than anticipated six-month salon revenues, we experienced rapidly escalating costs. We believe we have properly reacted to the cost increases and have implemented steps to contain such costs in the future. [A] new management team was installed to replace Regis and we are pleased with the new direction and enthusiasm Gary Hollister and his team bring to MEI salons.

> \* \* \* \* \* \*

> We continue to incur one-time legal expenses in the form of consulting fees, legal fees, employment related expenses and reorganizational expenses, much of which related to [the lawsuit against Regis arising from its management of the salons]. One-time expenses for the 1992 six-month period were approximately $4,100,000.

> \* \* \* \* \* \*

> Because of the need for cash with which to grow our business segments and to service out long term debt interest burden, we continue to discuss refinancing options with several investment bankers. Some of these refinancing options include seeking strategic partners to provide significant equity capital for both of the company's operating segments. It is our desire to reduce the interest burden of our long term debt in a meaningful way.

The *Salperto* plaintiffs allege that these statements failed to adequately disclose that if the discussions about refinancing and seeking strategic-partners were unsuccessful, it was doubtful whether the company could continue to operate. They allege that this omission violated Item 303 of SEC regulation S–K, 17 C.F.R. § 229.10, which requires disclosure of events or uncertainties which are likely to affect a corporation's liquidity. *Id.* § 229.303(a)(1)–(3).

The *Salperto* plaintiffs also allege that defendants failed to disclose this information in the management discussion and analysis section (MD & A) of MEI's second and third quarter 1992 10–Q forms. There defendants stated that short term liquidity was not a problem, and that long term liquidity needs "are anticipated to be funded by a combination of cash flows from operations, long-term financing, sale of nonoperating [assets]" and new long-term financing arranged with banks or other financial institutions or a private placement/strategic investor equity infusion.

On or about October 2, 1992 MEI announced that it was continuing discussions with strategic investors "to provide equity capital and augment profitability through a greater product base and greater distribution of all products." It made a similar announcement on October 23, 1992. The *Salperto* plaintiffs allege that defendants failed to disclose in both these statements that if discussions were unsuccessful, substantial doubt would exist about MEI's ability to survive.

On November 17, 1992 MEI reported third quarter losses of $8,680,000. The company characterized these losses as "very disappointing" but went on to state that they reflected progress in the medical segment, which would be increasing production-capacity to keep up with demand. It further stated that MEI was "continuing discussions with strategic investors" for the medical products and professional beauty salon subsidiaries "to provide significant equity capital and aug-

ment profitability." MEI also announced that it had received a proposal from the IMR Fund, L.P., to acquire 13,340,000 shares of MEI voting stock at a purchase price of $5.00 per share, and that the agreement was subject to the parties' due diligence.

In a press release issued November 20, 1992, MEI stated that the proposal was "worthy of consideration" because of the cash infusion, which would be used to expand New Dimensions in Medicine and the Salons and to continue the litigation against The Glemby Company. The *Salperto* plaintiffs allege that this statement was misleading because the cash was necessary for MEI to continue operating and that MEI's survival was doubtful without a cash infusion.

On December 2, 1992 MEI announced that its board of directors was in the process of evaluating the proposal and exploring other alternatives; it made the same announcement on December 23, 1992. On January 11, 1993 it announced that 100 management employees had been eliminated from the salon segment in order to position MEI more effectively for future years. On January 21, 1993 MEI then announced that it had signed a letter of intent with IMR. The *Salperto* plaintiffs allege that defendants did not disclose in any of these releases that MEI might not survive if the transaction was not completed.

*Brogren Complaint*

The *Brogren* plaintiffs allege the same facts that make up the *Salperto* complaint. In addition, they allege numerous misrepresentations and omissions between October 20, 1990 and August 11, 1992. For example, they allege that defendants misrepresented on the second quarter 1990 10–Q and 10–K forms that the company's capital was sufficient to meet long term needs. They further allege that the report misleadingly stated that "a substantial portion" of that quarter's loss was attributable to MEI's snack and candy group rather than the salons, and that the medical group and the salons contributed "positive operating income."

The *Brogren* plaintiffs also allege that defendants covered up the salons losses for the first and second quarters of fiscal year 1992 by blaming Regis with mismanagement of the salons and other factors such as escalating health care costs. The losses were attributed to "one-time expenses in the form of consulting fees, legal fees, employment related costs and reorganizational expenses resulting from disengagement from Regis Corporation management of the professional beauty salon." Plaintiffs assert that a new management team touted by MEI was unable to stop the losses, and that the supposed "one-time" losses were ongoing expenses that rapidly escalated.

On or about November 17, 1992, MEI reported a third quarter loss for 1992 of approximately $8.6 million. Plaintiffs allege that "[w]hile characterizing the Company's nine month results as 'very disappointing'" (*Brogren* Complaint, ¶ 86), Benson reported progress in the medical segment. On February 23, 1993, after IMR performed due diligence, IMR announced it would not proceed with the proposal as IMR was "unable to confidently quantify the extent of the liabilities, including contingent liabilities, and obligations of MEI Salons." On February 23, 1993, MEI announced it had filed for bankruptcy. Trading on MEI stock was halted because of the filing. When it resumed the next day, share prices had dropped from $4.50 to 50 cents.

Plaintiffs allege that at no time prior to February 23, 1993, was there a public disclosure that the MEI salons had contingent liabilities and obligations that could not be quantified.

## DISCUSSION

For the purposes of defendants' motions to dismiss, the court takes all facts alleged in plaintiffs' complaints as true. *Westcott v. Omaha*, 901 F.2d 1486, 1488 (8th Cir.1990). Further, the court must construe the allegations in the complaints and reasonable inferences arising from the complaints favorably to plaintiffs. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir.1986). A motion to dismiss will be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Id.*; *see Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

## A.

■ As a preliminary matter, plaintiffs object to certain documents submitted by defendants in support of their motions to dismiss pursuant to Rule 12(b)(6). Although not addressed by the Eighth Circuit, other circuits have determined that where a plaintiff chooses not to attach to the complaint, or incorporate by reference, a document upon which it relies, and is integral to the complaint, the defendant may produce such document in support of a motion to dismiss. *See e.g., I. Meyer Pincus and Assoc. v. Oppenheimer & Co., Inc.,* 936 F.2d 759, 762 (2nd Cir.1991); *Kramer v. Time Warner, Inc.,* 937 F.2d 767 (2nd Cir.1991); *Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2nd Cir.1991), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); *Haskell v. Time, Inc.,* 857 F.Supp. 1392 (E.D.Cal. 1994); *Furman v. Sherwood,* 833 F.Supp. 408 (S.D.N.Y.1993).

These courts have considered the documents upon which the complaints were based because "a plaintiff who pleads misrepresentations in a particular document ought not be permitted to defeat a motion to dismiss through the artifice of not attaching the critical document to the complaint." *Haskell,* 857 F.Supp. at 1397 (*citing, I. Meyer Pincus,* 936 F.2d at 762). "In these circumstances the rationale for converting a motion to dismiss into one for summary judgment—that plaintiff must have sufficient notice—'is largely dissipated' because the plaintiff had ample notice of a critical document on which the complaint is based." *Haskell,* at 1397 (*citing Cortec Indus.,* 949 F.2d at 47–48).

Plaintiff cites no cases to support their position and have not made a showing that the submission of only a portion of the documents referenced in plaintiffs' Complaints is misleading. Plaintiffs are not prejudiced by the submission of only a portion of the documents because for those documents not produced, this court must accept as true the allegations in the complaint concerning such documents. Furthermore, there are reported cases involving claims of fraud on the market that have considered documents referenced in the complaint. *See e.g., Furman v. Sherwood,* 833 F.Supp. 408, 410–411 (S.D.N.Y.1993); *In re Westinghouse Secs. Litig.,* 832 F.Supp. 948, 964, 976 (W.D.Pa. 1993).

Because plaintiffs have made numerous allegations that certain documents contain misrepresentations or omissions, the documents are relevant to determine what the documents stated, not to prove the truth of their contents. *Kramer,* 937 F.2d at 774. By relying upon such documents to establish its case, plaintiffs should not be allowed to "defeat a motion to dismiss through the artifice of not attaching" such documents to their complaints. *Haskell,* at 1397. Accordingly, this court will consider documents outside of the pleadings where such documents are referenced in the complaints.

## B.

■ A plaintiff must bring suit within one year of the discovery of the facts constituting the violation, or in no event more than three years after the violation. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 362, 111 S.Ct. 2773, 2782, 115 L.Ed.2d 321 (1991); *Davidson v. Wilson,* 973 F.2d 1391, 1402 (8th Cir.1992). The one-year limitations period begins when plaintiff is put on inquiry notice of the possibility of fraud. "Where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises." *Dodds v. Cigna Secs., Inc.,* 12 F.3d 346, 350 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1401, 128 L.Ed.2d 74 (1994). Once an investor receives "storm warnings" of possible fraud, it cannot sit back and wait for actual fraud to present itself. *Cook v. Avien, Inc.,* 573 F.2d 685, 698 (1st Cir.1978).

■ Defendants do not dispute that the *Salperto* plaintiffs timely filed their complaint. As against the *Brogren* plaintiffs, however, defendants allege they were put on actual or inquiry notice of all the alleged misrepresentations and omissions by defendants prior to one year before filing its complaint.

As plaintiffs correctly state, however, resolution of this issue depends upon when the alleged fraud should have been discovered.

The Court finds that the appropriate time for such a discovery is a factual inquiry which cannot be resolved on a motion to dismiss. *In re Professional Financial Management, Ltd.*, 703 F.Supp. 1388, 1394 (D.Minn.1989) (decision on whether a 10b–5 claim has been timely filed should be reserved for the trier of fact).

### C.

■ To state a cause of action under section 10(b) of the Securities Exchange Act and rule 10b–5, plaintiffs must allege: (1) a misrepresentation or omission; (2) of a material fact; (3) made with scienter; (4) in connection with the purchase or sale of securities; (5) upon which plaintiffs relied; and (6) that proximately caused plaintiffs' injuries. *Ross v. Bank South, N.A.*, 885 F.2d 723, 728 (11th Cir.1989), *cert. denied*, 495 U.S. 905, 110 S.Ct. 1924, 109 L.Ed.2d 287 (1990); *Royal American Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1015 (2d Cir.1989).

Plaintiffs' complaint alleges that defendants committed a series of securities violations between the time MEI acquired the Salons and the time it filed for bankruptcy. These allegations include: failure to disclose a failure to conduct adequate due diligence when acquiring the Salons, failure to comply with GAAP, SEC, and other regulations, failure to properly disclose mismanagement of the Salons, and overly-optimistic statements regarding the prospects of the Salons' success. In short, plaintiffs allege that defendants failed to disclose in a timely manner, if at all, important information about the status of the Salons.

As set forth below, the Court finds plaintiffs' claims for securities fraud to lack merit for a number of reasons. Foremost among these shortcomings is plaintiffs' complaint is their failure to show scienter, i.e., why the board of directors and officers of MEI would knowingly acquire a losing venture with inept management, sink millions of dollars in legal fees, consulting fees, and other expenses into the venture, terminate the old management and again intentionally hire new, inept managers to run the business, seek financing from another company to try and salvage MEI, sue the sellers for fraud and breach of

contract, and finally, plunge itself into bankruptcy, all in an effort to dupe the MEI investors and illegally profit from these investors' ignorance. Plaintiffs do not allege that any of the officers or board of directors ever sold their stock in MEI from the time when MEI acquired the Salons through the time MEI declared bankruptcy. As a result, defendants presumably lost a considerable amount of money when the company declared bankruptcy. Plaintiffs have failed to demonstrate to the Court any evidence or inference of intent to defraud.

■ This court has previously held that proof of reckless conduct is insufficient to demonstrate scienter under a rule 10b–5 claim. *In re Professional Financial Management, Ltd.*, 703 F.Supp. 1388, 1394 (D.Minn.1989). The facts of this case are much like the scenario which the Seventh Circuit discussed in *DiLeo v. Ernst & Young:*

The story in this complaint is familiar in securities litigation. At one time the firm bathes itself in a favorable light. Later the firm discloses that things are less rosy. The plaintiff contends that the difference must be attributable to fraud. "Must be" is the critical phrase, for the complaint offers no information other than the differences between the two statements of the firm's condition. Because only a fraction of financial deteriorations reflects fraud, plaintiffs may not proffer the different financial statements and rest. Investors must point to some facts suggesting that the difference is attributable to fraud.

901 F.2d 624, 627 (7th Cir.1990).

As discussed in detail below, the Court finds that there are no facts which give rise to a strong inference of fraudulent intent, a necessary component of any 10b–5 claim. A failure to adequately investigate the merits of a potential acquisition and subsequent steps to remedy that omission may give rise to a claim for negligence; but it cannot support a claim for securities fraud.

#### 1. The MEI Defendants
#### a. Allegations Regarding Intentional Failure to Conduct Adequate Due Diligence

■ In their Complaint, plaintiffs argue that defendants intentionally mismanaged

800

the company by failing to perform adequate due diligence in acquiring the Salons. Complaint, para. 68. They further argue that defendants knew that the manager which MEI had hired never intended to perform as represented and that as a result, "the Salons were a "cancer" that was having a material adverse effect upon MEI's operations." On March 12, 1992, plaintiffs further allege that defendants terminated the members of the Regis management team and again intentionally hired new management incapable of operating the Salons profitably in order to "lull the investment community into believing that MEI had gotten any problems it had with the Salons behind it." Complaint, para. 65.

Although plaintiffs claim that MEI intentionally failed to conduct due diligence and knowingly hired incompetent managers, plaintiffs provide no facts to support these allegations. Nor do plaintiffs offer any reason why defendants would knowingly sabotage their company. Absent such facts, plaintiffs' allegations amount to nothing more than claims of corporate mismanagement which fall outside the scope of securities fraud. *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (common law breach of fiduciary duty or mismanagement is not actionable under section 10(b)).

Rule 10b–5 is not intended to bring within its ambit simple corporate mismanagement or breaches of fiduciary duty in connection with a securities transaction. *St. Louis Union Trust Co. v. Merrill Lynch,* 562 F.2d 1040, 1048 (8th Cir.1977), *cert. denied,* 435 U.S. 925, 98 S.Ct. 1490, 55 L.Ed.2d 519 (1978). As the Third Circuit stated in *Craftmatic Securities Litigation v. Kraftsow,* 890 F.2d 628, 640 (3d Cir.1989), "[W]here the incremental value of disclosure is solely to place potential investors on notice that management is capable of . . . incompetence, the failure to disclose does not violate the securities acts."

■ In paragraph 68(d) of their Complaint, plaintiffs also argue that the individual defendants of MEI knew, at the time of acquisition, that the operation of the Salons could only be successful if they could revitalize the Salons and control labor costs. But

this statement contradicts plaintiffs' assertion that defendants intentionally performed an inadequate due diligence analysis of the Salons. Assuming that plaintiffs' allegations regarding defendants' lack of due diligence are true, it is unclear how defendants could have known that the Salons were "doomed from the start." Plaintiffs cannot simultaneously rely on their allegations of an intentional failure to conduct due diligence while also arguing that defendants knew from the start that it was acquiring an entity fraught with financial and personnel problems for a "grossly excessive price."

### b. Allegations Regarding Inadequate Disclosures

■ Plaintiffs also allege that defendants also failed to adequately inform the investors of all of the business risks involved in acquiring the Salons. For example, plaintiffs point out that defendants suffered losses from the acquisition of the Salons in 1990, yet did not divulge these losses from the Salons until 1992. Complaint, paras 44–61. And when defendants did divulge the loss, plaintiffs allege that defendants disclosed these losses "in the context of glowing statements about MEI's prospects with the intent that the investment community would overlook such negative information and believe that MEI had a bright future." Complaint, para. 62. Plaintiffs argue that defendants should have disclosed that the Salons were a "cancer" that was destroying MEI and the investments of plaintiffs.

A review of defendants' March 31, 1992 disclosures, however, indicates that defendants adequately disclosed the status of the Salons' operations. The *first sentence* of the March 12, 1992 letter from Carl Pohlad and Donald Benson states, "The past year's results from operations reflect great disappointment in part because of delays in the sale of the remnants of our snack food segment and the failure of our professional beauty salon group to meet profit expectations under the Management Agreement with Regis Corporation (Regis), a 20% owner of MEI Salon Corp." The May 1992 10–Q form also states that revenues decreased 9% due principally to decreased revenue in the

professional beauty salon segment. The paragraph further explains that the decrease was due in part to a sluggish retail economy as well as salon closings from the previous year. *Id.* These disclosures, as well as other statements recognizing the losses from the Salons, more than adequately meet the requisite standards of disclosure and explain to the investors that the Salons were not performing well.

■ Plaintiff further argues that defendants also had a duty to give the investors a reasonable estimate as to the viability of the Salons in the future and inform them of all of the risks involved. There is no duty, however, to disclose general business risks or engage in conjecture regarding the future of a business. *In re GlenFed Securities Litigation,* 11 F.3d 843, 849 (9th Cir.1993) (failure to predict future is not actionable); *Shapiro v. UJB Financial Corp.,* 964 F.2d 272, 283 (3d Cir.1992), *cert. denied,* 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992) (no obligation exists to explain events which are contingent or speculative in nature).

■ Defendants also argue that plaintiffs cannot predicate their fraud claims upon allegations that defendants failed to disclose that if MEI did not obtain a cash infusion from an outside source, MEI might not be able to continue operating as a going concern. In their 1992 report, defendants point to their disclosure in the 1992 Second Quarter Report that MEI was suffering from severe liquidity problems. MEI further pointed out that if it did not obtain outside financing, it would not be able to meet either its short-term or long-term liquidity needs. Thus, defendants conclude that they did not have to state the obvious, i.e., that MEI would not be able to continue operating *if it did not obtain outside financing.*

The Court agrees. A review of the reports referenced in the Complaint demonstrates that defendants adequately disclosed the financial condition of the company. The March 31, 1992 Form 10–Q report states that the first quarter net loss referenced in the financial statements stems primarily from losses in the Salon business. The June 30, 1992 report explains in detail the amount of loss which MEI incurred from the Salon business as well as an analysis of the reasons why MEI suffered such a significant operating loss.

Although plaintiffs argue that these disclosures did not adequately divulge the degree or magnitude of the poor performance of the Salons, the Court cannot, under existing case law, allow plaintiffs to premise a securities fraud action based upon such omissions. A number of Circuits, including the Eighth Circuit, have held that a company is not required to disclose all of the hazards of the business or risks which should be obvious to a reasonable investor. *See e.g., Alabama Farm Bureau Mutual Casualty Co., Inc. v. American Fidelity Life Insurance Co.,* 606 F.2d 602, 611 (5th Cir.1979), *cert. denied,* 449 U.S. 820, 101 S.Ct. 77, 66 L.Ed.2d 22 (1980) ("It was unnecessary for AMFI to outline any or all of the possible dangers that could be posed by a decrease in statutory capital and surplus; the disclosure that they would be decreased was adequate."); *Wielgos v. Commonwealth Edison Co.,* 892 F.2d 509, 515 (7th Cir.1989) ("Issuers need not 'disclose' Murphy's Law or the Peter Principle even though these have substantial effects on business ... Just as a firm needn't disclose that 50% of all new products vanish from the market within a short time, so [defendant] needn't disclose the hazards of its business, hazards apparent to all serious observers and most casual ones."); *Myzel v. Fields,* 386 F.2d 718, 736 (8th Cir.1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968) ("[T]here is no duty to disclose information to one who reasonably should already be aware of it.").

The financial statements and accompanying analysis of the 1992 10–Q reports demonstrate that the Salons were performing poorly and MEI needed a capital infusion for continued survival. Based on these statements, plaintiffs should also have been able to discern that MEI was not going to immediately divest itself of the Salons, but rather, was going to undertake significant financial and labor costs to try and revive the business. Furthermore, defendants fully disclosed the status of the litigation against Regis, Glenmore and Essanelle for fraud and breach of contract. Such a disclosure was, to

say the least, a significant warning sign that financial problems with the Salons were imminent and plaintiffs should proceed with caution.

### c. Allegations of Scienter

Even if the Court accepted plaintiffs' arguments that defendants failed to adequately disclose the losses from the Salons, plaintiffs' have failed to adequately allege scienter. Plaintiffs' complaints allege that defendants defrauded them for four reasons: (1) to protect and enhance the defendants' positions with MEI; (2) to enhance the value of their personal MEI holdings; (3) to maintain the illusion that MEI could bargain at arm's length; and (4) to conceal the mismanagement at MEI. Defendants urge the Court to dismiss plaintiffs' complaint because these allegations are insufficient to satisfy the scienter requirement. Defendants argue that plaintiffs premise their 10b-5 claim upon a fraud-by-hindsight theory that MEI's lawsuit against the sellers as well as its subsequent bankruptcy constituted part of an elaborate scheme to defraud plaintiffs. Such a theory, defendants conclude, does not satisfy the scienter pleading requirement. *See e.g., In re Donald J. Trump Casino Secs. Litig.,* 793 F.Supp. 543, 556–57 (D.N.J.1992), *aff'd,* 7 F.3d 357 (3d Cir.1993), *cert. denied,* 510 U.S. 1178, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994).

In refuting defendants' dismissal argument, plaintiffs rely on Judge Murphy's opinion in *In re Professional Financial Management, Ltd.,* 703 F.Supp. 1388 (D.Minn.1989) which held that the degree of scienter necessary in this circuit to prove liability under section 10(b) and rule 10b–5 is that defendant's conduct must be "other than in good faith." Plaintiffs argue that the allegations in their complaints demonstrate a lack of good faith by defendants. Plaintiffs assert that the false and leading misrepresentations and material omissions set forth in their complaint sufficiently describe the MEI defendants' involvement to withstand defendants' motion to dismiss.

■] The Court finds, however, these allegations do not satisfy the particularity requirements of scienter. This Court has previously held that the particularity requirement is to be *strictly* applied in the

context of securities fraud litigation as a means of deterring frivolous lawsuits. *Weisburgh v. St. Jude Medical, Inc.,* 158 F.R.D. 638, 641 (D.Minn.1994). A complaint must adduce specific facts which give rise to a "strong inference" of fraudulent intent. *In re Lifecore Biomedical, Inc. Securities Litigation,* 159 F.R.D. 513, 516 (D.Minn. 1993). As plaintiffs correctly state in their brief, *proof of reckless conduct is insufficient to sustain a rule 10b–5 claim. In re Professional Financial Management, Ltd.,* 703 F.Supp. at 1394 (emphasis added).

■ As set forth above, Plaintiffs' allegations that defendants devised this elaborate scheme of intentionally acquiring the Salons with inept management, terminating that management and again deliberately hiring new, incompetent management, engaging in concerted efforts to gain capital from another company, filing a lawsuit against the sellers, declaring bankruptcy, and losing millions of dollars from the 90% drop in the stock price, all in order to defraud plaintiffs, cannot withstand judicial scrutiny. Moreover, the Court cannot discern any gain which defendants stood to make from this alleged scheme. None of the defendants sold their stock prior to declaring bankruptcy and, as a result, their considerable investment in MEI presumably declined along with plaintiffs'.

As this Court has previously stated, an action for securities fraud may not rest on a bare inference that defendants must have known of the true facts as alleged by plaintiffs. *Lifecore Biomedical, Inc.,* 159 F.R.D. at 516. The allegations in this complaint do not set forth facts which give rise to a strong inference of fraud. Even if defendants were reckless in their endeavors to acquire and run the Salons, such recklessness does not, and cannot, support a 10b–5 securities fraud claim.

In summary, the Court finds that plaintiffs' claims against the defendants in this action for securities fraud lack merit. Plaintiffs have failed to meet their burden under ¶ 10(b) and rule 10b–5. Our securities laws do offer protection against fraudulent defendants who knowingly entice investors into losing ventures in order to profit from these

investors' ignorance. But these securities laws do not guarantee sound business practices nor they they protect investors from economic downturn. *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). When a firm loses money, it is the investors who often suffer the most; however, merely shifting these losses from one group to another does nothing to further the purposes of securities laws. As the Seventh Circuit stated, "Investors seeking relief under Rule 10b–5 have to distinguish their situation from that of many others who are adversely affected by business reverses." *DiLeo,* 901 F.2d at 626 (citing *Christidis v. First Pennsylvania Mortgage Trust,* 717 F.2d 96, 99–100 (3d Cir.1983). The plaintiffs in this case have failed to perform this task.

*2. The IMR Defendants/Irwin L. Jacobs*

 Plaintiffs' specific allegations against the IMR defendants and Irwin L. Jacobs fail for the same reasons as those against MEI— there are no facts which give rise to a strong inference of fraud. The complaint is devoid of any facts from which the Court can infer that either Mr. Jacobs or the IMR defendants knew that the disclosures were allegedly false and misleading.

Moreover, plaintiffs' allegations that Mr. Jacobs should have known or was reckless with respect to the disclosures in the SEC forms do not satisfy the particularity requirement of rule 9(b). *In re Professional Financial Management, Ltd.,* 703 F.Supp. at 1394 (proof of reckless conduct is insufficient to sustain a rule 10b–5 claim). Thus, plaintiffs' allegations that Jacobs and/or the IMR defendants should have known or were reckless in their disclosures regarding the Salons cannot support plaintiffs' securities fraud claims.

 As to plaintiffs' allegations that Jacobs and the other defendants conspired to "artificially inflate" the price of the stock, there are no allegations in the complaint that Jacobs or any of the other defendants bought or sold MEI stock during the relevant time period. Without any supporting facts, plaintiffs simply state that "Defendant Jacobs and IMR made material misrepresentations as to the value of Brown–Minneapolis Tank Company when they submitted the Proposal to MEI, knowing that an inflated value for that company would inflate the value of the Proposal and lead the public to believe that MEI's stock had a value of $5.00 per share." Complaint, para. 108. No specific facts are alleged as to *why* defendants would attempt to fraudulently bolster the price of the stock. The complaint only contains general allegations that defendants engaged in fraud in order to maintain and/or enhance the value of their own holdings of MEI's securities, to attempt to preserve their considerable cash compensation from MEI, to maintain the illusion that MEI could bargain at arm's length, and conceal mismanagement of MEI.

The complaint fails to allege, however, how defendants enhanced the value of their holdings at MEI during the relevant period when the stock price declined in value by 90% after MEI declared bankruptcy. In fact, the Court of Appeals in *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061 (5th Cir. 1994) recently affirmed a dismissal of a securities fraud claim under rule 10b–5 where, among other things, plaintiffs failed to allege that defendants purchased or sold any stock during the class period. Like plaintiffs in the present action, Tuchman claimed that defendants defrauded plaintiffs in order to create an artificially-inflated picture of DSC's financial condition, increase the company's market share, and preserve defendants' positions and value of shares. *Id.* at 1068.

The Court, however, held these allegations insufficient to maintain an action for securities fraud. *Id.* They stated that:

> [I]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated. On a practical level, were the opposite true, the executives of virtually every corporation in the United States would be subject to fraud allegations. It does not follow that because executives have components of their compensation keyed to performance, one can infer fraudulent intent."

*Id.* at 1069 (quoting *Tuchman v. DSC Communications Corp.,* 818 F.Supp. 971, 976 (N.D.Tex.1993)).

The reasoning of the *Tuchman* cases are appropriate to the facts in the present action. No facts are alleged which would enable any of the defendants to benefit directly from the alleged fraud. The fact is that the stock price of MEI fell from $5.00 to $.50 and presumably, plaintiffs *and* defendants lost a significant amount of money. Although defendants could derive some monetary benefit from keeping the price high in order to attract more investors, any such benefit seems insignificant in comparison to the loss that defendants presumably suffered from the drop in the stock price. The Court cannot discern any monetary reason why Jacobs or the IMR defendants would contrive an elaborate scheme of fraud in order to simply show the public that MEI could bargain at arm's length.

### D.

28 U.S.C. section 1367 provides, in pertinent part "(c) The district courts may decline to exercise supplemental jurisdiction over a claim ... if— ... (3) the district court has dismissed all claims over which it has original jurisdiction." In this case, plaintiffs base their claim of negligent misrepresentation solely upon supplemental jurisdiction. Because the Court finds that plaintiffs'· securities fraud claims, which are the basis of original jurisdiction, should be dismissed, jurisdiction over the negligent misrepresentation claims will also be dismissed pursuant to 28 U.S.C. section 1367(c)(3).

### *ORDER*

Based upon the aforementioned analysis and all of the files, records, and proceedings, it is hereby ORDERED that:

1. Defendants, MEI, Irwin L. Jacobs, and IMR Fund et al.'s respective Motions to Dismiss Plaintiff Brogren et al.'s and Plaintiff Salperto et al.'s claims under section 10(b) of the Securities Exchange Act and rule 10b–5 are *GRANTED*; and

2. Pursuant to 28 U.S.C. section 1367, Defendants, MEI, Irwin L. Jacobs, and IMR Fund et al.'s respective Motions to Dismiss Plaintiff Brogren et al.'s and Plaintiff Salperto et al.'s claim of negligent misrepresentation is *GRANTED*.

LET JUDGMENT BE ENTERED ACCORDINGLY.