**James W. PARKHILL, Plaintiff,**

v.

**MINNESOTA MUTUAL LIFE INSURANCE COMPANY, Defendant.**

**No. 97–CV–515.**

United States District Court, D. Minnesota.

Aug. 25, 2000.

Jack L. Chestnut, Karl L. Cambronne, Jeffrey D. Bores, Becky L. Erickson, and Chestnut & Brooks, Minneapolis, MN, Barry A. Weprin, Melvyn I. Weiss, Brad N. Friedman, Andrew W. Hutton, and Milberg, Weiss, Bershad, Hynes & Lerach, New York City, San Diego, CA, Andrew S. Friedman, and Bonnett, Fairbourn, Friedman & Balint, Phoenix, AZ, Stephen L. Hubbard, Robert W. Biederman, and Cantilo, Maisel & Hubbard, Dallas, TX, Ronald R. Parry, and Arnzen, Parry & Wentz, Covington, KY, for plaintiff.

Garold M. Felland, The Minnesota Mutual Life Insurance Company, St. Paul, MN, James F. Jorden, Waldemar J. Pflepsen, Jr., and Jorden, Burt, Berenson & Johnson, Washington, D.C., Wayne S. Moskowitz, Gary J. Haugen, and Maslon, Edelman, Borman & Brand, Minneapolis, MN, for defendant.

## ORDER

DOTY, District Judge.

This matter is before the court on the parties' cross-motions for summary judgment. Based on a review of the file, record, and proceedings herein, and for the reasons stated, the court grants defendant's motion for summary judgment and denies plaintiff's motion for summary judgment.

## BACKGROUND

The general background to this case has been set forth in two of the court's prior orders, *Parkhill v. Minnesota Mutual Life Insurance Co.*, 995 F.Supp. 983 (D.Minn. 1998) ("Parkhill I") and *Parkhill v. Minnesota Mutual Life Insurance Co.*, 188 F.R.D. 332 (D.Minn.1999) ("Parkhill II"). In 1986, plaintiff James Parkhill and his wife Mary purchased a life insurance policy from Terry Russo, an agent for defendant Minnesota Mutual Life Insurance Company. Parkhill made an initial premium payment of $645.50. The policy provided $30,000 of five-year term coverage, with an annual premium due each year of $1,291.08. Parkhill claims that he purchased the policy with the understanding, conveyed by Russo, that he would be required to make one initial out-of-pocket payment only. All subsequent premium payments, he believed, would be covered by the dividends internally generated by the policy.

In 1988, the Parkhills increased the face amount on the policy to $40,000, increased the annual premium to $3,7912 for three years and a lower amount thereafter, and changed the policy to a whole life plan. James Parkhill has testified that the policy upgrade was to be funded by the cash value of two other insurance policies that he agreed to surrender to Minnesota Mutual, along with the dividends generated by the policy. Mary Parkhill has testified that there was to be an initial out-of-pocket payment as well. The Parkhills ended up making two premium payments of $3,791 to Minnesota Mutual, once in 1988 and once in 1989. The Parkhills are uncertain as to what amount of the value of the surrendered policies went to Minnesota Mutual. There is also no indication that they received a policy dividend check during that period.

In 1990, after consulting with Minnesota Mutual, the Parkhills elected to stop making premium payments on the policy. Minnesota Mutual continued sending the Parkhills annual policy reviews indicating the diminished value of the policy while on stop premium status. On February 8, 1994, the Parkhills received a letter from Ted Cannella, the Minnesota Mutual agent who replaced Russo, advising that the policy would expire with no value if premium payments did not resume. The Parkhills resumed paying premiums.

On February 4, 1997, Parkhill filed a thirteen count complaint against Minnesota Mutual in Minnesota state court arising out of the failure of his policy to sustain itself without additional premium payments. Minnesota Mutual removed the action to federal court and filed a motion to dismiss or, in the alternative, for summary judgment. In *Parkhill I*, the court granted Minnesota Mutual's motion in part and denied it in part, dismissing several claims but permitting Parkhill to proceed on the claims that now make up his amended complaint. In *Parkhill II*, the court denied Parkhill's motion for class certification, which raised new allegations that Minnesota Mutual had improperly implemented its "Ultimate Interest" method of crediting interest on the cash value of its life insurance policies. After a period of discovery, the parties now bring cross-motions for summary judgment.

## A. Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In order for the moving party to prevail, it must demonstrate to the court that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c). A fact is material only when its resolution affects the outcome of the case. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *See id.* at 252, 106 S.Ct. 2505.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. *See id.* at 250, 106 S.Ct. 2505. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. *See Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Moreover, if a plaintiff cannot support each essential element of its claim,

summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. *See id.* at 322–23, 106 S.Ct. 2548.

### B. The Two Sets of Allegations by Parkhill

Parkhill's motion papers make it clear that he is essentially pursuing two actions under the caption of this case, one based on the allegations contained in the amended complaint and one based on evidence that allegedly emerged during discovery.

The claims contained in the amended complaint are (1) breach of contract; (2) breach of fiduciary duty; (3) breach of duty to deal with insured in good faith; (4) unjust enrichment/imposition of a constructive trust; (5) deceptive trade practices under Minn.Stat. § 325D.43 et seq.; (6) consumer fraud under Minn.Stat. § 325F.69 et seq.; (7) declaratory relief; and (8) reformation. These claims are founded upon a fundamental allegation: Minnesota Mutual promised Parkhill that if he paid an initial premium amount, plus the values from other pre-existing insurance policies, these amounts would generate sufficient values to pay all future premiums due on the policy. In other words, the premiums would "vanish."

The claims contained in the second, unpleaded action are: (1) breach of contract; (2) deceptive trade practices under Minn. Stat. § 325D.43 et seq.; and (3) consumer fraud under Minn.Stat. § 325F.69 et seq. These claims are founded on the allegation that Minnesota Mutual failed to adhere to its advertised Ultimate Interest method of crediting interest to the cash value of Parkhill's policy. The court will address the two sets of claims separately.

### C. Claims in the Amended Complaint

Minnesota Mutual moves for summary judgment on all claims contained in the amended complaint. Plaintiff's principal response to Minnesota Mutual's motion for summary judgment on these claims is that "[r]educed to its essence, Minnesota Mutual's Motion for Summary Judgment is simply an attempt to have this court revisit issues already decided in [*Parkhill I*]." Parkhill's Opp.Br. at 1. However, nothing in the court's discussion in *Parkhill I* was meant to resolve conclusively any fact issue or to foreclose Minnesota Mutual from bringing another Rule 56 motion. Now that discovery has been conducted and the key witnesses have been deposed, the court is in a position to examine the evidence the jury will be asked to consider at trial. Based on this examination of the record evidence, the court concludes that summary judgment is appropriate on all of the claims in the amended complaint

#### 1. Statute of Limitations

 First, Parkhill's common law claims for breach of contract, breach of fiduciary duty, breach of the implied duty to deal with insured in good faith, and the statutory claims of deceptive trade practices and consumer fraud must be dismissed on the ground that they were not timely filed.[1] Each of these claims is subject to a six year statute of limitation. *See* Minn.Stat. § 541.05, subds. 1(1), (2) & (6). Thus, for Parkhill's claims to be timely, they must have accrued within six years of the commencement of this action on February 4, 1997. A breach of contract action "accrue[s] at the time of the breach, even though actual damages occur later." *Levin v. C.O.M.B. Co.*, 441 N.W.2d 801, 803 (Minn.1989). A breach of fiduciary duty

---

1. Statutes of limitations are procedural in nature and therefore governed by the law of the forum, Minnesota. *See Davis v. Furlong,* 328 N.W.2d 150, 153 (Minn.1983).

claim accrues when a plaintiff "became aware, or should have become aware by reasonable diligence, of the facts supporting the claim." *Anderson v. Anderson,* 293 Minn. 209, 197 N.W.2d 720, 726 (1972). Finally, the statutory fraud claims accrue at the time the alleged statutory violation occurred. *See Klehr v. A.O. Smith Corp.,* 875 F.Supp. 1342, 1352 (D.Minn.1995). Therefore, Parkhill's common law and statutory claims accrued, at the latest, when Minnesota Mutual required the Parkhills to make additional out-of-pocket payments to maintain the policy. *See Parkhill,* 995 F.Supp. at 990 n. 9.

Parkhill acknowledges that he and his wife repeatedly paid Minnesota Mutual insurance premiums beginning in 1986. He argues, however, that these payments were not truly out-of-pocket expenditures:

> From 1987 through 1993, Mr. Parkhill made no out-of-pocket premium payments. In 1987, the premium payments were made with policy dividends. In 1988, ... the premiums were paid from the values of other insurance policies. From 1989 through 1993, Minnesota Mutual requested no premium payments.

Pl.Opp.Br. at 5. The post-discovery record wholly contradicts these assertions, however. What the evidence actually shows is this: Only months after the 1986 policy was issued and for the period during which premium obligations were due in 1986 and 1987, Parkhill was receiving "dividend checks" for amounts well below the annual premiums required under the policy. In 1987, for example, Parkhill paid premiums of $1,291.08 and received dividends of $412. Moreover, after upgrading the policy in 1988, Parkhill was required to make two separate premium payments of $3,791. However, neither Parkhill nor his wife recall receiving offsetting dividend checks during this period.

By this point, there should have been no question in Parkhill's mind that he still had premium obligations and that his premiums were not vanishing. However, Minnesota Mutual soon made this fact even more obvious. In 1989, Parkhill received an annual policy review stating that he owed yet another $3,791, an amount clearly in excess of the stated policy dividend of $540.97. *See* 3/89 APR (Pl. Bates 0093). In the face of this continuing premium obligation, Parkhill elected to stop paying premiums, an option available under the policy.[2] After stopping payment, Parkhill and his wife received annual policy reviews from Minnesota Mutual, each of which advised:

> At this time you are not being billed for regular base premiums. However, a mortality cost was deducted from your policy cash value to keep base protection active. We encourage you to resume premium payments and improve the case value.

3/90 & 3/91 Annual Policy Reviews (Def. Dep.Exh.26, 28). Moreover, in March 1990, after Parkhill stopped payment, Minnesota Mutual reissued the policy and sent Parkhill an illustration of his current policy values. This illustration clearly shows that the policy will expire in 1994 at guaranteed interest rates and in 2000 at current interest rates. *See* 3/90 Policy Information at 3 (Def.Dep.Exh.27). This is virtually the same information that Parkhill alleges he learned for the first time in the February 1994 letter from Minnesota Mutual agent Ted Cannella.

In sum, by 1990 Parkhill had (1) repeatedly been billed by Minnesota Mutual for premium amounts far in excess of the

---

**2.** Of course, the Parkhills' decision to exercise the stop-payment option would have made little sense if they truly still believed that the policy was self-funding.

dividends amounts generated by the policy, (2) repeatedly paid premiums far in excess of the dividend amounts generated by the policy, to the point where they felt required to exercise the stop-payment option in their policy and (3) been presented with essentially the same information about their ongoing out-of-pocket premium obligations that they claim they learned about for the first time in 1994. Given this evidence, and giving Parkhill the benefit of every reasonable inference, there can be no dispute that by 1990, Minnesota Mutual had reneged on its alleged oral promise concerning vanishing premiums and that Parkhill was aware or should have been aware of this fact. In other words, there can be no dispute that Parkhill's claims accrued, at the latest, in 1990. Because a 1990 accrual date falls well outside the statutory period for plaintiff's common law and statutory claims, those claims are time-barred.

## 2. Breach of Contract

■ Even if plaintiff's breach of contract claim was not time-barred, the court would be required to dismiss it on several other grounds. First, discovery has made it abundantly clear that enforcement of the alleged vanishing premium promise would violate the parol evidence rule. "The parol evidence rule makes inadmissible evidence concerning discussions prior to or contemporaneous with the execution of a written instrument when that evidence contradicts or varies the terms of the written instrument." *See Gutierrez v. Red River Distrib., Inc.,* 523 N.W.2d 907, 908 (Minn. 1994) (quotations and citation omitted). *See also Olive v. Tampa Educational Cable Consortium,* 723 So.2d 883, 884 (Fla. Dist.Ct.App.1998) (stating that the parol evidence rule "serves as a shield to protect a valid, complete and unambiguous written instrument from any verbal assault that would contradict" the construction of a

written instrument). In *Parkhill I,* the court declined to apply the parol evidence rule to bar extrinsic evidence of the parties' intent on the ground that the policy does not expressly discuss the source of the premium payments, that is, whether premium payments must be made out-of-pocket or whether they may include other modes of payment, including the value of existing policies or policy dividends. *See* 995 F.Supp. at 990. Thus, the court concluded, parol evidence may be admissible to explain the parties' intent on this point. *See id.*

■ It is now apparent, however, that plaintiff's evidence concerning defendant's alleged oral promise violates the parol evidence rule. Parkhill and his wife have testified that the vanishing premium promise made by Minnesota Mutual agent Russo was essentially this: If Parkhill pays an initial premium amount, plus the values from other policies, Minnesota Mutual will guarantee that the internal value of the dividends will be enough to pay all future premiums. However, this promise directly contradicts the unambiguous language of the policy at issue here, which expressly disavows any such dividend guarantee: "Each year we determine if you will share in our divisible surplus. We call your share a dividend and credit it to you on your policy anniversary." 1988 Reissued Policy at 8 (Def.Dep.Exh.19). Further, the policy illustrations presented to Parkhill by Russo in 1986 and by Minnesota Mutual in the years thereafter clearly stated that dividends cannot be guaranteed. *See, e.g.,* 1986 Policy Information at 3 (Def.Dep.Exh.8). Because the parol evidence rule prohibits the use of extrinsic evidence to contradict or modify the express terms of the insurance policy, the court concludes that the alleged oral contract between the parties may not be enforced.

■ Second, the alleged oral agreement between the parties is barred by the statute of frauds. Minnesota and Florida courts will not enforce an oral agreement that, by its terms, is not to be performed within one year from its making. *See* Minn.Stat. § 513.01(1); FlaStat. § 725.01. Here, Parkhill alleges an oral agreement in which he would make three years of premium payments of $3791, using cash from dividends and other insurance but not out-of-pocket expenditures. Because this agreement could not be performed within one year, and because it was not memorialized in any written form, it is unenforceable as a matter of law.

■ Finally, even if the court were to recognize an enforceable oral agreement, it is uncontroverted that Parkhill failed to fulfill his own obligations under the agreement. Parkhill alleges that when he decided to increase the face value of the policy to $40,000 in 1988, the increased premiums were to be paid by contributing the cash values of his other insurance policies. However, the record establishes that Parkhill failed to apply the full proceeds from the other insurance policies to the payment of premiums. *See* J. Parkhill Depo. at 189–93; M. Parkhill Depo at 122). Further, when he stopped payment on the policy in 1990, Parkhill stopped applying proceeds from any source to pay premiums. This action is unquestionably a breach of the alleged oral contract between the parties. Given plaintiff's own breach of the agreement, Minnesota Mutual was excused from performing its future contractual obligations. *See Conroy v. Book Automation, Inc.,* 398 N.W.2d 657, 660 (Minn.Ct.App.1987); *Lucite Center, Inc.,* 606 So.2d 492 (Fla.Dist.Ct.App. 4th Dist.1992).

### 3. Breach of Fiduciary Duty

■ Parkhill's claim for breach of fiduciary duty fails on the merits as well.

As this court concluded in *Parkhill I,* there is no per se rule precluding the existence of a fiduciary relationship between an insurer and its insureds. *See* 995 F.Supp. at 991. In *Stark v. Equitable Life Assurance,* the Minnesota Supreme Court recognized the possibility of a fiduciary relationship in the insurance context, stating that a "fiduciary relation exists when confidence is reposed on one side and there is resulting superiority and influence on the other." 205 Minn. 138, 285 N.W. 466, 470 (1939) (quotation omitted). However, the *Starks* court also made it clear "that a fiduciary relationship is not established between the agent and plaintiff and the faith and confidence the plaintiff had in the agent, since plaintiff should have known the agent was representing adverse interests." *Kennedy v. Flo–Tronics, Inc.,* 274 Minn. 327, 143 N.W.2d 827 (1966) (discussing the limited holding of *Stark*). Under Minnesota law, it is clear that special circumstances are required to create a fiduciary relationship between an insurer and an insured. *See Stark,* 285 N.W. at 470 (allowing breach of fiduciary duty claim against insurance company where agent has solicited a special relationship with the insured); *cf. Klein v. First Edina Nat'l Bank,* 293 Minn. 418, 196 N.W.2d 619, 622–23 (1972) (requiring special circumstance to support breach of fiduciary duty claim in lender-borrower context).

■ Here, plaintiff has proffered no evidence of special circumstances that would impose a fiduciary duty on Minnesota Mutual. While Parkhill was a longstanding policyholder with Minnesota Mutual, discovery has clarified that their relationship was always arm's length in nature. Parkhill testified that he had no contact of any kind with any Minnesota Mutual agent between the sale of his 1970 policy and his initial communications with Russo in 1985,

and that Russo was a complete stranger to him when they first met. Moreover, the Parkhills interacted with several other insurance companies and agents concerning life insurance; indeed, they purchased life insurance from other insurers. Nothing in the record indicates that the relationship between Minnesota Mutual and the Parkhills was anything other than the normal relationship between an insurer and the insured. Thus, plaintiff's breach of fiduciary duty claim must be dismissed for failure to establish the existence of a fiduciary duty.

### 4. Breach of the Duty to Deal with Insured in Good Faith

■ Under both Minnesota and Florida law, a cause of action for breach of the implied duty and good faith does not exist independently of a breach of contract claim. *See Medtronic, Inc. v. ConvaCare, Inc.*, 17 F.3d 252, 256 (8th Cir.1994) (applying Minnesota law); *Orthomet, Inc. v. A.B. Medical, Inc.*, 990 F.2d 387, 392 (8th Cir.1993) (same); *Kelly v. Gill*, 544 So.2d 1162, 1164 (Fla.Dist.Ct.App. 5th Dist.1989). For the reasons discussed above in Parts C.1 and C.2, the court has concluded that plaintiff's breach of contract claim is not viable. Thus, as a matter of law, the court must dismiss plaintiff's claim of breach of the duty to deal with the insured in good faith.

### 5. Statutory Fraud Claims

■ In *Parkhill II*, the court stated that plaintiff must demonstrate individual reliance on the alleged misrepresentation to prevail on his statutory claims for deceptive trade practices and consumer fraud. *See* 188 F.R.D. at 344–45. The record evidence now demonstrates that plaintiff cannot have reasonably relied upon any misrepresentations Russo allegedly made about vanishing premiums. As discussed in Part C.2, neither the policy nor the written materials associated with the policies provide a guarantee that the policies will sustain themselves. Indeed, these written documents expressly state that dividends cannot be guaranteed. Further, it is undisputed that only months after the 1986 policy was issued and for the period during which premium obligations were due in 1986 and 1987, Parkhill was receiving "dividend checks" for amounts well below the annual premiums required under the policy. This pattern of dividend payment and premium billing put Parkhill on immediate notice that Russo's alleged representation about vanishing premiums must be false. For him to rely on Russo's alleged representation in these circumstances would have been wholly unreasonable. Because plaintiff cannot show reasonable reliance, an essential element of both his statutory claims, those claims must be dismissed.

### 6. Equitable Claims

■ The court must also dismiss all of Parkhill's equitable claims. With respect to the claim for declaratory relief, Parkhill has failed to establish liability on any of his underlying substantive claims. With respect to the reformation claim, Parkhill has failed to establish by clear and convincing evidence that the contract failed to express the true intentions of the parties. *See Klimstra v. State Farm Auto Ins. Co.*, 891 F.Supp. 1329, 1339 (D.Minn.1995) (setting forth the standard for reformation under Minnesota law).

■ Finally, with respect to the unjust enrichment claim, plaintiff cannot show that Minnesota Mutual "knowingly received or obtained something of value for which the defendant 'in equity and good conscience' should pay." *ServiceMaster of St. Cloud v. Sentry Ins.*, 544 N.W.2d 302, 306 (Minn.1996). In billing Parkhill for

premium amounts, Minnesota Mutual acted in strict accordance with the express terms of the policy, which stated that the policyholder is obligated to pay annual premiums. There is nothing unjust about Minnesota Mutual receiving premium payments in exchange for providing life insurance coverage.

## D. Ultimate Interest Claims

The parties also bring cross-motions for summary judgment on Parkhill's claims arising out of Minnesota Mutual's alleged failure to adhere to its advertised Ultimate Interest method of crediting interest to the cash value of Parkhill's policy. As Parkhill states it in his summary judgment brief,

> In the course of discovery, Mr. Parkhill learned that one of the reasons his policy did not perform as it was supposed to because Minnesota Mutual had failed to credit interest to his policy in accord with the policy terms; this dereliction by the company contributed to the failure of his premiums to vanish as promised.

Pl's S.J.Br. at 1.

Parkhill claims that Minnesota Mutual's conduct in this regard constitutes a breach of contract, a deceptive trade practice, and consumer fraud. As stated, these allegations appear nowhere in plaintiff's amended complaint. For that reason alone, Parkhill's Ultimate Interest claims must be dismissed, especially to the extent that plaintiff seeks to hold Minnesota Mutual responsible for fraudulent conduct. *See* Fed.R.Civ.Pro. 9(b) (requiring allegations of fraud to pleaded with particularity). More important, however, the record is devoid of evidence supporting Parkhill's Ultimate Interest claims.

## 1. Breach of Contract

To prevail on his breach of contract claim, Parkhill must show (1) formation of a contract; (2) performance by plaintiff of any conditions precedent; (3) a material breach of the contract by defendant; and (4) damages. *See Briggs Trans. Co. v. Ranzenberger*, 299 Minn. 127, 217 N.W.2d 198, 200 (1970); *Boatwright Construction, Inc. v. Kemrich Knolls*, 306 Minn. 519, 238 N.W.2d ,606, 607 (1976) (breach must be material); *Beck v. Lazard Freres & Co.*, 175 F.3d 913, 914 (11th Cir.1999) (applying identical Florida law). However, Parkhill has failed to establish even the threshold element of contract formation. In *Parkhill II,* this court held that "because Ultimate Interest was not described in the written policy itself, to be a part of the contract of insurance information about this interest-crediting methodology must have been conveyed to class members in some other way." 188 F.R.D. at 341. However, it is undisputed (1) that Parkhill was never shown Ultimate Interest information at or about the time he purchased the Minnesota Mutual policies, (2) that Parkhill never discussed Ultimate Interest with Russo, and (3) that Ultimate Interest is not mentioned in the policy or in any marketing material attached to his policy. Indeed, Parkhill has repeatedly stated that the issue of interest was unimportant to him. *See* Parkhill Dep. 116, 275; Parkhill's S.J.Br. at 10 (stating that he "did not 'rely' on 'Ultimate Interest' when he purchased his policy").

Moreover, even if Ultimate Interest was a part of the policy, Parkhill has produced no evidence supporting his allegation that Minnesota Mutual materially breached the policy by misapplying the Ultimate Interest accounting method or that Parkhill suffered damage. Indeed, the only record evidence specifically directed at these issues refutes the allegations of material breach

and damages. *See generally* First and Second Thoen Affs.

### 2. Statutory Fraud Claims

 To prevail on his statutory claims for deceptive trade practices and consumer fraud, Parkhill must show that some aspect of Ultimate Interest was misrepresented to him and that Parkhill reasonably relied upon that misrepresentation. *See Parkhill II,* 188 F.R.D. at 344. However, Parkhill received no information about Ultimate Interest from Russo and has acknowledged that he did not rely on Ultimate Interest when purchasing the policy. Because Parkhill has failed to establish a misrepresentation or reasonable reliance, his statutory claims are not viable.

### CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1. Defendant's motion for summary judgment is granted.

2. Plaintiff's motion for summary judgment is denied.

3. Plaintiff's amended complaint is dismissed with prejudice.