**MINNESOTA LIFE INSURANCE COMPANY, Plaintiff,**

v.

**FINANCIAL INSTITUTION CONSULT-ING CORPORATION and Larry P. Chinn, Defendants.**

No. 15–cv–2109–SHL-tmp

United States District Court,
W.D. Tennessee, Western Division.

Signed 11/28/2017

Kelly D. Simpkins, Kevin A Rogers Wells Marble & Hurst, PLLC, Ridgeland, MS, for Plaintiff.

Michael P. Coury, Jessica Lyn Indingaro, Ryan Michael Skertich, Glankler Brown, PLLC, Memphis, TN, for Defendants.

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

SHERYL H. LIPMAN, UNITED STATES DISTRICT JUDGE

Larry Chinn and his company, Financial Institution Consulting Corporation, (collec-

tively, "Defendants") entered into two contracts with Minnesota Life Insurance Company ("Minnesota Life" or "Plaintiff"). In those contracts, Defendants agreed to sell Plaintiff's life insurance policies, and Plaintiff agreed to pay Defendants commissions on those sales. Defendants also agreed that they would repay to Plaintiff some percentage of commissions earned on the sale of any policies that were later surrendered by the policyholder. In this lawsuit, Plaintiff claims that Defendants failed to repay commissions on surrendered policies, and Defendants argue that they are entitled to retain some of the commissions, based on Plaintiff's failure to inform Defendants of defects in the insurance products at issue.

Before the Court is Minnesota Life Insurance Company's Motion for Summary Judgment, filed August 22, 2017. (ECF No. 115.) Defendants filed their response September 16, 2017. (ECF No. 124.) Plaintiff filed a reply on October 3, 2017. (ECF No. 129.) For reasons more fully explained below, the Court **GRANTS** Plaintiff's Motion for Summary Judgment.

## FACTS

Based on the parties' filings, there are no genuine disputes as to the following material facts, unless otherwise noted.

### I. Mr. Chinn and FICC

Mr. Chinn graduated as salutatorian from both the University of Memphis and the University of Memphis School of Law. (Defendants' Response to Plaintiff's Concise Statement of Material Facts, ECF No.

124–1 at 1.) He practiced insurance defense law in the Memphis area for approximately five years, and was then hired by a banking consulting firm. (Id. at 1.) Around the mid–1980's, he earned his license to sell life insurance and established his own consulting firm, Financial Institution Consulting Corporation ("FICC"), serving as President and CEO. (Id. at 1–2.) As a consultant, Mr. Chinn "provided a full range of consulting services with emphasis on employee benefit and executive compensation planning, as well as a [sic] formulation of bank holding companies, acquisition and merger planning," and capital, tax and estate planning. (Id. at 1.)

As an insurance salesman, Mr. Chinn proved to be prolific, selling insurance for sixteen major life insurance companies. (Id. at 2.) Mr. Chinn was also an innovator, claiming to have developed "the first single premium life insurance policy sold to a financial institution which included design of a rider to waive surrender charges." (Id.) Mr. Chinn also developed the idea to "use premium financing with high cash value policies," a concept used in the policies at issue here. (Id. at 3.)[1]

The parties agree that Mr. Chinn became interested in premium financing, "and began discussions with premium financing companies about using high cash value policies for collateral." (Id. at 3.) Mr. Chinn intended to sell "unique financed life plans," in which a policyholder would purchase a life insurance policy, finance the premium, and make interest payments on the loan "until such time as the cash surrender value would support the interest

1. Plaintiff asserts that Defendants were "highly sophisticated with regard to universal life policies, how they operated, and their use in the premium financing space." (See id. at 5.) Defendants dispute this fact by pointing to ¶ 28 of the "Chinn Declaration." However, this paragraph claims only that Mr. Chinn's inability to "run a two tiered illustration" on the software provided to him by Minnesota

Life impeded his ability to evaluate the policies. (ECF No. 124–9 at 7–8.) In addition, FICC's website touted Defendants' "extensive experience in knowledge and benefit plan design, high cash value life insurance, and community banks which is [sic] enabled us to find innovative methods of securing our clients' financial resources." (ECF No. 124–1 at 5–6.)

expense." (Id.) At that point, the policy-holder would "assign the policy as collateral for the loan and then repay the loan through the death benefits." (Id.) Mr. Chinn described at least one of the life insurance policies included in his "unique financed life plans" as "specially designed," "meaning that they included riders to waive surrender charges and refund substantially all or 100% of the premiums if the policy was surrendered in the early years of the policy." (Id.)

Defendants "sold hundreds of premium finance policies through Pacific Life, Alliance, Phoenix Home Life, and Indianapolis Life before selling the first Minnesota Life policy with premium financing." (Id. at 4.) Defendants knew that lenders required certain financial information to issue premium loans, at least in part through Defendants' discussions with premium finance companies about "the use of high cash value policies as collateral as well as the rates and the design of the case [sic]." (Id. at 5.)

## II. The Minnesota Life Policies

Around 2008, "Mr. Chinn concluded that Minnesota Life might have a product that he could use in his business." (Id. at 6.) The parties met at least twice to discuss Minnesota Life's product. (Id. at 6.) At the time of these meetings, Minnesota Life offered an "indexed universal life insurance policy,"[2] called the "Eclipse Indexed Life Policy" ("Eclipse Policy"). (Id. at 7.) Minnesota Life would subsequently offer an "Early Values Agreement" ("EVA") rider, which "eliminate[d] surrender charges in the early years of the policy." (Id. at 7.) Minnesota Life had also begun work on a "Surrender Value Enhancement Agreement" ("SVEA") rider in 2008, which provided that "if the policy [was] surrendered within the first 3 years, 100% of the premiums [would be] refunded." (Id. at 7–8.) When the parties first met, however, Minnesota Life "did not offer a rider that would refund 100% of premiums if surrendered in the early years of the policy." (Id. at 7.)

The parties executed two contracts, the "Broker Contracts," in January 2009. (Id. at 6.) Under those agreements, Defendants would be paid commissions on products sold, but Defendants would also be obligated to return a percentage of their commissions "on any premiums that [were] subsequently returned or otherwise not received" by Minnesota Life, a sum called a "chargeback." (Id. at 6–7.) Minnesota Life was also empowered to retain commissions to offset any chargebacks. (Id. at 11.)

"As part of Defendants' sales presentation, they would run illustrations on Minnesota Life software ... to illustrate performance of the policy under a given set of assumptions," which included "the insured's age, gender, tobacco use, planned premium outlay, face amount, allocation of premium outlays between fixed and indexed accounts, and credit rating." (Id. at 8.) Defendants dispute that they "had the option to run supplemental illustrations with more detail or run additional illustrations with different assumptions." (Id. at 8–9.) Defendants complain that "[a]ny illustrations that FICC could have run were subject to the limitations of Minnesota Life's software[,] which expressly did not permit running two tiered illustrations[3] or

---

**2.** A "universal" life insurance product is one that is intended to be permanent and that has a savings element with a shifting interest rate. An "indexed" universal life insurance product is one that is tied to the performance of an outside stock index, such as the Standard & Poor's 500 ("S & P 500") Index.

**3.** A "two-tiered illustration" is one that would have allowed employees at FICC to "change credit rates midstream." (ECF No. 115–23 at 124.) Without this function, the model could not be run such that, for example, the credit

illustrations at a 0% credit rating." (Id. at 9 (internal quotation marks omitted).) Mr. Chinn also testified during his deposition that he had "never run an illustration in [his] life," but that FICC analysts would run the illustrations for him. (ECF No. 115–23 at 123.)

Ultimately, "Defendants sold 29 Eclipse Policies with a SVEA Rider," including to policyholders in Tennessee and Minnesota. (Id. at 8.) FICC also purchased an Eclipse Policy that insured Mr. Chinn's life for $18,000,000. (Id. at 10.) "Minnesota Life paid Defendants $10,153,416.26 in commissions for the 29 policies." (Id. at 10.) However, all 29 policies, including Mr. Chinn's, were surrendered within three years. (Id. at 11.) Because all of the policies included a SVEA rider, the Court assumes that 100 percent of the premiums were refunded by Minnesota Life. (See id. at 8.) Solely under the terms of the Broker Contracts, then, Defendants became liable to pay chargebacks to Plaintiff. (See id. at 6–7.)

Defendants do not dispute that, under the Broker Contracts, the appropriate chargeback would be $4,196,995.60; that "[p]ursuant to the Broker Contracts, Minnesota Life has withheld a sum of $763,696.68 in commissions earned by Chinn in order to offset the chargebacks"; that "Chinn has repaid Minnesota Life a sum of $896,000 for the debt owed to Minnesota Life"; and that the remaining chargeback would be $2,537,298.72. (Id. at 11.) "Defendants have stipulated to this amount as the correct calculation," but dispute "that it is owed" (id.), presumably based on their contentions in the counterclaims where they argue that Plaintiff did not provide adequate information about the policies at issue.

When the policyholders began surrendering their policies in 2010, "FICC entered into a Promissory Note ("Note")

with Minnesota Life," which established a payment schedule for the chargebacks owed by Defendants to Minnesota Life. (Id. at 11.) Eventually, this Note encompassed all of the chargebacks associated with all 29 surrendered policies. (See id. at 12.) The balance of the Note came due on January 1, 2014, and Defendants do not dispute that "FICC has not paid the balance of the note." (Id.) The Note has also accumulated interest, but the parties dispute the calculation of that interest. (Id.) Finally, Defendants do not dispute that "costs and fees," related to this lawsuit and recoverable under the Note, "are $176,460.03." (Id.)

Concurrent with the Note, Mr. Chinn also executed a Guaranty Agreement ("Guaranty") in 2010, in which he

> absolutely, primarily, unconditionally and irrevocably guarantee[d] to Minnesota Life . . . (i) the full, prompt and absolute payment, performance, observance and discharge by FICC of all of FICC's obligations and liabilities contained in the [Note and Broker Contracts]; (ii) any cost, expense or liability of any nature which Minnesota Life incurs arising out of or related to the [Note and Broker Contracts]; and (iii) all costs and expenses, including reasonable attorneys [sic] fees, incurred by Minnesota Life in enforcing any of its rights or remedies under [the Note and Broker Contracts].

(Id. at 13.) Mr. Chinn does not dispute that he has failed to cure FICC's default under the Note. (Id.) Because of the disputed interest, as well as "for all the reasons set forth in Answer and Defendants' Memorandum in Response and related documents," Defendants dispute that either Defendant is liable for the amount calculated by Minnesota Life, which is $26,567,588.19. (Id.)

---

rate used in the first two years is 8 percent, but drops to 0 percent in years three and four.

## STANDARD OF REVIEW AND CHOICE OF LAW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court is to view facts in the record and to draw reasonable inferences from those facts in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Once a properly supported motion for summary judgment has been made, the party opposing summary judgment must show that there is a genuine dispute of material fact by pointing to evidence in the record or must argue that the moving party is not entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c)(1). While the Court views all evidence and factual inferences in the light most favorable to the non-moving party, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).

In addition, the opposing party "cannot rest solely on the allegations made in [his] pleadings." Everson v. Leis, 556 F.3d 484, 496 (6th Cir. 2009) (quoting Skousen v. Brighton High Sch., 305 F.3d 520, 527 (6th Cir. 2002)) (alteration in original). Rather, when a motion is supported by documentary proof, the nonmoving party is obligated to present "specific facts showing that there is a genuine issue for trial." Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994). It is insufficient "simply [to] show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 587, 106 S.Ct. 1348. A "mere scintilla" of evidence is also insufficient to establish that the nonmoving party may be entitled to a verdict. Anderson, 477 U.S. at 252, 106 S.Ct. 2505. In this Circuit, the nonmoving party must "put up or shut up" regarding critical issues. Lord v. Saratoga Cap., Inc., 920 F.Supp. 840, 847 (W.D. Tenn. 1995) (citing Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478 (6th Cir. 1989)).

Minnesota law applies here, given the choice-of-law provisions in the Broker Contracts, Note and Guaranty. (See Broker Contracts §§ 4.10, ECF Nos. 115–4 at 4, 115–5 at 5; Note § 4(b), ECF No. 115–6 at 3; Guaranty § 9, ECF No. 115–7 at 3.) Neither party disputes the validity of these choice of law provisions.

## ANALYSIS

Plaintiff argues that there is no genuine dispute of material fact with respect to Defendants' breach of the Broker Contracts, Note and Guaranty. Indeed, Defendants evidently do not dispute that these contracts were formed, that Plaintiff paid Defendants commissions, that the policies were ultimately surrendered, that Plaintiff has assessed chargebacks, and that Defendants have failed to pay. (See e.g., ECF No. 124 at 21 ("Defendants acknowledge the enforceability of the contracts and Note and Guaranty" and claim to "seek damages pursuant to the underlying contracts ... and to recoup or set-off appropriate amounts of [Minnesota Life]'s damages, if the Court finds there are any.").)

Defendants do dispute the amount owed. Defendants first dispute the amount of interest to which Plaintiff is entitled under its breach of contract claim. Defendants also assert that they are entitled to "some recovery" or "recoupment" based on their counterclaims. The Court considers each of these arguments in turn.

## I. Interest on Plaintiff's Breach of Contract Claim

Plaintiff argues, and Defendants do not dispute, that Defendants are obligated to return $4,196,995.40 in chargebacks according to the terms of the Broker Contracts. (ECF No. 124–1 at 11.) The parties agree that Minnesota Life has withheld $763,696.68 in commissions to offset the chargebacks, and that Mr. Chinn has paid $896,000 toward the chargebacks. (Id.) Therefore, Defendants have a remaining outstanding obligation to remit $2,537,298.72 in chargebacks. (Id.) The parties also agree that, for the purposes of this Motion, "fees and expenses incurred at the time of the filing of the Motion were $176,460.03." (Id. at 13.)

The terms of the Note provide that "[t]he outstanding unpaid principal balance on this Note [i.e., the chargebacks] shall accrue interest starting on January 1, 2013 at the interest rate . . . of five percent (5%). All interest hereunder and [sic] shall be compounded on a monthly basis." (ECF No. 115–6 at 2.) Plaintiff argues that the interest owed by the time Plaintiff filed its Motion for Summary Judgment was $19,174,747.73. (Plaintiff's Memorandum in Support of Motion for Summary Judgment, ECF No. 115–1 at 7.)

Defendants, however, argue that the interest owed is $560,477.50. (Defendants' Response in Opposition, ECF No. 124 at 6.) In reply, Plaintiff agreed to accept Defendants' calculation of interest, "so as to avoid a trial on the issue." (ECF No. 129 at 3.) For the purposes of the Motion,

then, the parties are in agreement that Defendants owe $560,477.50 in interest related to the outstanding chargebacks. Accordingly, the parties agree that Defendants owe Plaintiff $3,274,236.25 in chargebacks, interest, attorney's fees and expenses.

Because there is no genuine dispute of material fact regarding Mr. Chinn's breach of contract, Plaintiff is entitled to judgment as a matter of law on this claim. The only question remaining is whether Defendants' counterclaims entitle them to a reduction of the debt owed to Plaintiff.

## II. Defendants' Counterclaims

Defendants argue that they are entitled to "some recovery" or "some set-off or recoupment against [Minnesota Life]'s claims," because of Minnesota Life's alleged failure to disclose certain features of the policies at issue. (ECF No. 124 at 5.) Defendants' Counter–Complaint alleges that Minnesota Life failed to disclose that "based on either a 3% guaranteed rate . . . or a 0% crediting [sic] rate . . . [,] the cash surrender value [in the first three years] would be significantly less than the outstanding cumulative premium loan balance[,] which would require a Policy owner to pay a significant amount to the premium finance lender in order to keep it in force" (ECF No. 112 at 8); that premium finance lenders would require illustrations of the policies under both conditions "prior to making and/or renewing premium loans" (id. at 9–10); and that "the charge structure of the Policy was very high," a fact masked by the SVEA rider. (Id. at 8.) [4]

---

4. Defendants complain that the Eclipse Policy "had an inherently flawed design because the charge structure of the Policy was very high, and the SVEA rider masked that, since it artificially inflated the cash surrender value of the Policy for the first three years." (ECF No. 112 at 8.) While inherent design flaws are often alleged in products liability cases, Defendants have pleaded counterclaims for failure to disclose, intentional misrepresentation,

negligent misrepresentation, and breach of contract and the implied covenant of good faith and fair dealing. In addition, as Plaintiff points out, the appropriate forum to raise a claim regarding the design of the policy would be with the regulatory agencies that approve these kinds of policies. (ECF No. 115–1 at 9–10.) The Court will therefore treat criticism of the policy's design as an addition-

Defendants contend that Plaintiff's silence about these features violated the implied covenant of good faith and fair dealing and constituted negligent and intentional misrepresentations.

## A. Implied Covenant of Good Faith and Fair Dealing

■ Defendants first claim that the failure to disclose these features of the Eclipse Policies constitutes a breach of the implied covenant of good faith and fair dealing. A claim for the breach of the implied covenant of good faith and fair dealing, however, cannot stand without an underlying breach of the contract. See Parkhill v. Minn. Mut. Life Ins. Co., 174 F.Supp.2d 951, 960 (D. Minn. 2000), aff'd, 286 F.3d 1051 (8th Cir. 2002) (citing, inter alia, Medtronic, Inc. v. ConvaCare, Inc., 17 F.3d 252, 256 (8th Cir. 1994) (applying Minnesota law); Orthomet, Inc. v. A.B. Medical, Inc., 990 F.2d 387, 392 (8th Cir. 1993) (same)) ("Under ... Minnesota ... law, a cause of action for breach of the implied duty and good faith does not exist independently of a breach of contract claim."). In Parkhill, the court found that the underlying breach of contract claim was not viable, and was therefore obliged, as a matter of law, to dismiss the claim for breach of the duty of good faith and fair dealing. Parkhill, 174 F.Supp.2d at 960.

Defendants have pointed to no action on the part of Plaintiff that constitutes a breach of contract. In apparent acknowledgement of this defect, Defendants cite In re Hennepin County 1986 Recycling Bond Litig., 540 N.W.2d 494 (Minn. 1995), for the proposition that Defendants "need not first establish an express breach of contract claim." Id. at 503. However, the court in In re Hennepin County was evaluating a motion to dismiss (not one for summary judgment) and found that the plaintiffs had stated a claim upon which relief could be granted with respect to the underlying express breach of contract claim. Id. at 501. Because Defendants have failed to demonstrate, or even allege, that there was an express breach of the underlying contracts by Plaintiff, Plaintiff is entitled to judgment as a matter of law on Defendant's counterclaim for breach of the implied covenant of good faith and fair dealing.

## B. Failure to Disclose, Intentional Misrepresentation and Negligent Misrepresentation

To prevail on any of the remaining claims, Defendants must demonstrate, as an element of each claim, that Plaintiff had a duty to disclose the features of the Eclipse Policies with which Defendants find fault.[5] Generally, there is no duty to

al disclosure that Defendants allege Plaintiff was obligated to make.

In addition, the Court has considered and rejects Plaintiff's argument that Defendants' counterclaims should be dismissed on the basis of Federal Rule of Civil Procedure 9(b). See Coffey v. Foamex L.P., 2 F.3d 157, 162 (6th Cir. 1993) ("[I]n the absence of [a] motion for more definite statement under Rule 12(e), dismissal on this basis alone would not be appropriate.").

5. Because Defendants ultimately fail to establish this duty, the Court considers the misrepresentation and failure to disclose claims together and assumes, without deciding, that Defendants' claims would not have otherwise

been barred by the applicable statutes of limitations. Defendants must have demonstrated that Plaintiff owed a legal or equitable duty to disclose to maintain their misrepresentation claims. See L & H Airco, Inc. v. Rapistan Corp., 446 N.W.2d 372, 380 (Minn. 1989) ("Nondisclosure does not constitute fraud absent a legal or equitable obligation to communicate facts to a particular person [who is] entitled to the information."); Richfield Bank & Trust Co. v. Sjogren, 309 Minn. 362, 244 N.W.2d 648, 650 (1976) ("Before nondisclosure may constitute fraud ... there must be a suppression of facts which one party is under a legal or equitable obligation to communicate to the other, and which the other party is entitled to have communicated to him.");

disclose. Graphic Commc'ns Local 1B Health & Welfare Fund "A" v. CVS Caremark Corp., 850 N.W.2d 682, 695 (Minn. 2014). Whether such a duty existed here is a question of law. Larson v. Larson, 373 N.W.2d 287, 289 (Minn. 1985). "Courts applying Minnesota law have been reluctant to impose a duty to disclose material facts in arm's-length business transactions between commercial entities." Driscoll v. Standard Hardware, Inc., 785 N.W.2d 805, 813 (Minn. App. 2010). However, the Minnesota Supreme Court has recognized three "special circumstances" in which a duty to disclose may arise, including that:

(a) One who speaks must say enough to prevent his words from misleading the other party.

(b) One who has special knowledge of material facts to which the other party does not have access may have a duty to disclose these facts to the other party.

(c) One who stands in a confidential or fiduciary relation to the other party to a transaction must disclose material facts.

Klein v. First Edina Nat'l Bank, 293 Minn. 418, 421, 196 N.W.2d 619 (1972) (internal citations omitted).

■■■ None of these "special circumstances" apply here. Under the first Klein circumstance, Defendants argue that Minnesota Life's representation "that these policies would work well" obliged Minnesota Life to disclose the additional information "to clarify" its representation. (ECF No. 124 at 11.) However, "[t]here is no duty ... to disclose general business risks," "all of the hazards of the business" or "risks which should be obvious to a

reasonable investor." Brogren v. Pohlad, 933 F.Supp. 793, 801 (D. Minn. 1995). In addition, Plaintiff's representation that the Eclipse Policies would "work well" was not an "untrue statement[ ] of material fact," because it was "puffery as a matter of law." See Teng Moua v. Jani–King of Minnesota, Inc., 810 F.Supp.2d 882, 890 (D. Minn. 2001) (statements that owning franchise was "good business" and that the franchise would continue for "a long time" were not "untrue statements of material fact ... because they [were] puffery as a matter of law"). Because these "typical sales statements cannot be material to a serious business decision," they do not require the type of "clarification" envisioned by Klein. See id.

■■■ Defendants also argue that the second Klein circumstance applies, contending that Plaintiff had "special knowledge" that was unknown to Defendants. The "special knowledge" circumstance is a fraud theory that the Minnesota Supreme Court has "rarely addressed." Graphic Commc'ns, 850 N.W.2d at 697. This theory originated in 1868 in a case involving the sale of distempered sheep, where the Minnesota Supreme Court found that the defendant, who knew "his sheep to be infected with a contagious distemper, [and] sold them to plaintiff, concealing the disease, ... was guilty of a fraud which made him responsible for the damage." Marsh v. Webber, 13 Minn. 109, 114 (1868). In a more recent case, the Minnesota Supreme Court found that a duty to disclose existed where a bank had actual knowledge that one of its depositors was engaging in fraud that

---

Berreman v. W. Publ'g Co., 615 N.W.2d 362, 375 (Minn. App. 2000), review denied (Minn. Sept. 26, 2000) ("[S]ilence does not constitute fraud in the absence of a duty to speak."). Establishing a duty to disclose may also have been relevant to overcoming Plaintiff's arguments regarding the applicable statutes of limitations. Toombs v. Daniels, 361 N.W.2d 801, 809 (Minn. 1985) (tolling appropriate

"[i]n view of the fiduciary relationship between [plaintiff and defendants] and [the defendants'] fraudulent misrepresentations by silence") (emphasis added); Cohen v. Appert, 463 N.W.2d 787, 790 (Minn. Ct. App. 1990) (citing Wild v. Rarig, 302 Minn. 419, 234 N.W.2d 775, 795 (1975)) (tolling "in the absence of a fiduciary relationship" requires "something of an affirmative nature").

would ultimately damage its client. Richfield Bank & Trust Co. v. Sjogren, 309 Minn. 362, 244 N.W.2d 648, 651 (1976). However, this case was later distinguished by the Minnesota Supreme Court where plaintiffs argued that defendants "had special knowledge of [defendants'] prescription-drug acquisition costs, and therefore had a duty to disclose these costs." Graphic Commc'ns, 850 N.W.2d at 697–98. The court rejected the argument, finding that the special knowledge circumstance was not applicable where "there [was] no allegation that the [defendants] had actual knowledge of fraudulent conduct." Id. at 698. Here, because Defendants allege special knowledge of underlying facts, rather than special knowledge of fraudulent conduct on the part of Plaintiff or a third-party, the Court concludes that, as a matter of law, the "special knowledge" circumstance is not applicable to the present circumstance.

Finally, under the third Klein circumstance, Defendants argue that Plaintiff had a fiduciary duty to disclose. (ECF No. 124 at 11.) Plaintiff responds that Defendants' "general allegation of the existence of fiduciary duty," without specific factual support, is insufficient to allow Defendants to survive the motion for summary judgment. (ECF No. 115–1 (citing RBC Dain Rauscher, Inc. v. Fed'l Ins. Co., 2003 WL 25836278, at *11 (D. Minn. Dec. 2, 2003); In re Lutheran Bhd. Variable Ins. Prod. Co Sales Practices Litig., 2004 WL 909741, at *11 (D. Minn. Apr. 28, 2004).))

Indeed, to find a fiduciary relationship where one does not typically exist, Minnesota courts require the moving party to demonstrate some basis for the claim of a fiduciary relationship: that the "fiduciary" knew or had reason to know that a beneficiary was "placing trust and confidence in [it] and relying on [it] to counsel and inform him"; that the beneficiary placed its confidence in the fiduciary, "re-sult[ing] in superiority and influence over" the beneficiary; that there was an asymmetry of information between the parties in favor of the fiduciary, in combination with a "confidential relationship"; or that the parties had "disparate levels of business experience," and the fiduciary invited the beneficiary "to place his confidence in [it]." Roers v. Countrywide Home Loans, Inc., 728 F.3d 832, 838 (8th Cir. 2013) (lender and borrower). It may also be enough that the fiduciary advised the beneficiary not to employ counsel, invited the beneficiary instead to communicate directly with the fiduciary, or "targeted" the beneficiary, exploited the beneficiary's ignorance or acknowledged the relationship as a fiduciary one. Cherne Contracting Corp. v. Wausau Ins. Companies, 572 N.W.2d 339, 342–43 (Minn. Ct. App. 1997) (insurer and insured); RBC Dain Rauscher, Inc. v. Fed'l Ins. Co., 2003 WL 25836278, *12 (D. Minn. Dec. 2, 2003) (same).

Defendants have failed to allege any special circumstance that would create a fiduciary duty in this case. Defendants' point to no reason that they would have been relying on Plaintiff and no reason that Plaintiff should have thought that Defendants were relying on Plaintiff. Contrary to the situations described by the Minnesota Supreme Court, it appears that the parties here had similar levels of business experience and similar access to information. Plaintiff argues, convincingly, that "Defendants' knowledge, experience and sophistication equaled or exceeded that of Minnesota Life's representatives," such that Defendants' reliance on Minnesota Life to disclose details necessary for Defendants' business venture would have been unreasonable. (ECF No. 115–1 at 11, 17); see also Valspar Refinish, Inc. v. Gaylord's, Inc., 764 N.W.2d 359, 369 (Minn. 2009) ("Reliance in fraud cases is generally evaluated in the context of the aggrieved party's intelligence, experience, and oppor-

tunity to investigate the facts at issue."); Midland Nat. Bank of Minneapolis v. Perranoski, 299 N.W.2d 404, 413 (Minn. 1980) ("A fiduciary's duty must be defined with reference to the experience and intelligence of the person to whom the duty is owed.").

The undisputed facts support the conclusion that no such special circumstance existed here. Plaintiff's representative testified that he did not recall any discussion of riders at initial meetings, because he "likely made the assumption that Larry was very familiar with term insurance riders," at least in part because Mr. Chinn had used a rider "in one of the sales he did with us." (ECF No. 115–32 at 29.) Defendants themselves knew what financial information lenders would require in order to issue premium loans, at least in part because Defendants discussed their business plan with premium finance companies. (Undisputed Material Facts, ECF No. 124–1 at 5.) Finally, Defendants provide no reason to believe that Plaintiff targeted or exploited Defendants, or encouraged Defendants not to seek legal counsel.[6]

Defendants look to the Restatement of Agency as support for the existence of a fiduciary relationship, but this citation is unavailing. The Third Restatement § 8.15 instructs that "[a] principal has a duty to deal with the agent fairly and in good faith, including a duty to provide the agent with information about risks of . . . pecuniary loss that the principal knows, has reason to know, or should know are present in the agent's work but unknown to the agent." However, a principal's duty to deal fairly and in good faith with an agent is not fiduciary in nature. Restatement (Third) of Agency § 1.01 (2006) ("The obligations that a principal owes an agent, specified in §§ 8.13–8.15, are not fiduciary.").[7]

Defendants also repeatedly refer to a Montana Supreme Court case as support for the proposition that a principal-agent relationship necessarily creates a fiduciary duty. (ECF No. 124 at 7, 11.) Leaving aside the lack of precedential value of the case, the issue there was not whether a fiduciary duty existed between principal and agent—the district court concluded that it did, under the Restatement of Agency.[8] Marie Deonier, & Assoc. v. Paul Revere Life Ins. Co., 301 Mont. 347, 9 P.3d 622, 626 (2000). As explained above, however, this Court concludes that the duty described in § 8.15 the Third Restatement is not fiduciary in nature. Moreover, the bulk of the Montana Supreme Court's analysis in that case was focused on whether the duty had been breached, not whether it existed. Id. at 626–29.

While "[t]he existence of a fiduciary relationship is usually a question of fact,"

6. Reliance would also necessarily have to be reasonable. It is not clear to the Court, however, what prevented Mr. Chinn from making basic inquiries that would allow him to assess the risks of Plaintiff's product. Defendants complained that "what [Plaintiff's representatives] didn't talk about was the risks and potential pitfalls" of pairing the product with the rider. (Chinn Deposition, ECF No. 115–20 at 163). However, Defendants admit that Defendants "didn't ask that [question]" to Plaintiff's representatives. (Id. at 163–64.)

7. As discussed, infra, it is also unclear that the sale of the Eclipse Policies presented any real risk of, or resulted in, any pecuniary loss to Defendants.

8. The Montana Supreme Court considered § 435 of the Second Restatement of Agency. The Second Restatement of Agency § 435 is substantially similar to the Third Restatement of Agency § 8.15 ("[A] principal contracts to use care to inform the agent of risks of physical harm or pecuniary loss which, as the principal has reason to know, exist in the performance of unauthorized acts and which he has reason to know are unknown to the agent.").

Toombs v. Daniels, 361 N.W.2d 801, 809 (Minn. 1985), Defendants still must demonstrate that there is a genuine issue of material fact regarding the existence of the same. However, Defendants point to no factual dispute regarding this issue, and the Court concludes, as a matter of law, that no such relationship exists. For this reason alone, dismissal of Defendants' counterclaims would be merited. Moreover, Defendants have also failed to demonstrate that Plaintiff breached any supposed duty, that Defendants' alleged reliance on Plaintiff was reasonable, or that any supposed breach resulted in damages to Defendants.

■ A material factual dispute regarding breach has not been demonstrated because record evidence overwhelmingly suggests that Plaintiff itself was unaware of the information that Defendants insist Plaintiff was obligated to disclose. Defendants complain that Plaintiff did not disclose how the SVEA rider would pair with the Eclipse Policies at initial meetings, but Plaintiff did not offer that rider at the time of the meetings. (Undisputed Material Facts, ECF No. 124–1 at 7.) Defendants also complain that Plaintiff knew underlying information that would allow it to conclude that Eclipse Policies were likely to be surrendered at a very high rate, but Defendant Chinn's own testimony supports the conclusion that Minnesota Life anticipated a much lower surrender rate:

Q. Why would—what motivation would Minnesota Life have to have you sell a product that is going to get surrendered in three years—

A. Well, I don't think they thought that.

Q. It doesn't even pay you [sic] back 100 percent of the commissions. Spends all that money on underwriting and getting [sic]? What motivation would it have to do that?

A. ... I don't think they considered— that there was going to be a high risk of surrender with this product. [ ] I think they miscalculated. I think they thought the product would stay on the books longer than they have, in fact, stayed on the books....

Q. ... [T]hey had the same motivation as you to see it [sic] stay in force beyond the three years, didn't they?

A. Oh, absolutely. They did not want— Minnesota Life did not want to [sic] nor did they expect, otherwise they wouldn't have done it, to have products surrendering as early as they did. So I think they miscalculated in that regard.

(ECF No. 115–20 at 215–17.) Plaintiff's agents also believed that the surrender rate would be closer to 6 percent. (ECF No. 115–31 at 8–9.) [9] As Plaintiff argues, it cannot be held accountable for the failure to disclose that which it did not know.

■ Finally, even assuming that Defendants could establish duty and breach, Defendants have not pointed to any proof of damages to create a genuine dispute of fact. What support Defendants do offer is too speculative to be recoverable as a matter of law.[10] Defendants argue that they have been damaged because they "could

---

9. Minnesota Life actuarial analyst Seth Detert testified that Minnesota Life "did do [sic] and looked at a variety of scenarios and the economic impacts of those scenarios and the impact of what we believe a reasonable lapse rate could be.... So we believed that on a high side we would see about a 6% lapse rate on SVEA by the end of year 3, at the end of year 3." (Id.)

10. The Court assumes, without deciding, that recoupment would be possible if Defendants' claims had been able to withstand summary judgment, given that Minnesota courts define recoupment "broadly" and allow recoupment for "obligations connected with" a contract. See Household Fin. Corp. v. Pugh, 288 N.W.2d 701, 703, 705 (Minn. 1980).

have sold 29 insurance prospects policies issued by [Minnesota Life]'s competing carriers [that] did not have a 100% probability of surrender and earned compensation comparable to that earned [through] [Minnesota Life]." (ECF No. 124 at 19.) [11] As Plaintiff notes, however, Defendants have failed to identify other comparable companies, policies or commissions in support of this assertion. (ECF No. 129 at 8.) Plaintiff also points to Defendant Chinn's deposition testimony that only a "low percentage" of similar policies issued in concert with other insurance companies are still in force and effect. (ECF No. 115–23 at 114.)

 As a matter of law, Defendants unsupported assertions regarding damages are too speculative to be recoverable. "Under Minnesota law, the controlling principle governing actions for damages is that damages which are speculative, remote, or conjectural are not recoverable." Brown v. Diversified Distribution Sys., LLC, 801 F.3d 901, 910 (8th Cir. 2015) (citing Leoni v. Bemis Co., 255 N.W.2d 824, 826 (Minn. 1977)) (internal quotation marks omitted). When the record contains "no proof beyond speculation" that a claimant was actually damaged, summary judgment is appropriate. Brown, 801 F.3d at 910 (quoting Storage Tech. Corp. v. Cisco Sys., Inc., 395 F.3d 921, 928 (8th Cir.2005)).

## CONCLUSION

The Court finds that there is no genuine dispute of material fact with respect to Plaintiff's breach of contract claim against Defendants, and that Defendants have failed to demonstrate that there is any genuine dispute of material fact with respect to Defendants counterclaims. In addition, based on the undisputed facts, Plaintiff is entitled to judgment as a matter of law. The Court therefore **GRANTS** Plaintiff's Motion for Summary Judgment. Defendants' counterclaims are meritless and are therefore **DISMISSED.** Judgment in favor of Plaintiff will be entered in the amount of $3,274,236.25.

**IT IS SO ORDERED**, this 28th day of November, 2017.

---

**11.** Defendants also argue that they are "damaged by the fact that [Minnesota Life] is seeking to recover commission chargebacks of $2,537,298.72 plus an astronomical amount of interest." (Id.) However, Defendants agree that $2,537,298.72, plus interest, is the amount due under the contracts, the validity of which they have not challenged. In addition, Plaintiff has agreed to accept Defendants' interest calculation. As Plaintiff points out, Defendants are currently in possession of these commissions only by virtue of the contracts, such that repayment of these commissions, as provided in the contracts, cannot be considered "damaging" to Defendants in the legal sense. Finally, Plaintiff cites evidence that "[e]ven after Defendants are required to honor their obligation to repay the chargebacks, they will still retain approximately $6,000,000 in commissions from … Minnesota Life." (ECF No. 115–1 at 12.)